Arthur Earl WILSON, Jr., Appellant,

v.

STATE of Alaska, Appellee.

No. A–6396.

Court of Appeals of Alaska.

Oct. 23, 1998.

Paul E. Malin, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, C.J., and MANNHEIMER and STEWART, JJ.

*OPINION*

MANNHEIMER, Judge.

In February 1995, Arthur Earl Wilson, Jr., was an inmate in the detention unit of the McLaughlin Youth Center. In the early morning hours of February 21st, Wilson tried to escape; his plan was to seize a set of keys from one of the counselors in the detention unit, Abby Baskin.

Using a strip of fabric torn from a towel, Wilson attacked Baskin, wrapping the fabric around her neck and strangling her. Wilson then pulled Baskin into his cell, pushed her down on his bed, and tried to wrest the keys from her control. Unable to gain control of the keys, Wilson continued to strangle Baskin. Wilson's attack was halted when another counselor saw what was happening and pulled Wilson off Baskin. Baskin suffered a number of injuries during this attack (cuts, bruises, and abrasions), but none of them was serious.

Wilson was indicted for attempted murder, an unclassified felony, and two counts of first-degree assault, a class A felony.[1] Because Wilson was older than 16, he was tried as an adult for these crimes.[2] The jury acquitted Wilson of these charged offenses, but they found him guilty of the lesser included offense of second-degree assault.[3]

*Wilson's constitutional attacks on his conviction*

Wilson argues that, even though he was properly charged as an adult for the crimes of attempted murder and first-degree assault, he should not have been convicted as an adult after the jury found him guilty of only the lesser offense of second-degree assault. Instead, Wilson argues, he should have been adjudged a juvenile delinquent.

Under AS 47.12.030(a), had Wilson been found guilty of either of the original charges (attempted murder or first-degree assault), he would automatically have been sentenced as an adult. But Wilson was convicted of second-degree assault, a class B felony.[4] Be-

1. Attempted first-degree murder, AS 11.41.100(a)(1), is an unclassified felony; *see* AS 11.31.100(d)(1). First-degree assault, AS 11.41.200(a)(2), is a class A felony; *see* AS 11.41.200(b).

2. Former AS 47.10.010(e), now renumbered as AS 47.12.030(a).

3. AS 11.41.210(a)(1).

4. AS 11.41.210(b).

cause Wilson was found guilty of this lesser degree of felony, the superior court was obliged to give Wilson the opportunity to prove, by a preponderance of the evidence, that he was amenable to treatment within the juvenile justice system—that is, to prove that he probably could be rehabilitated (by juvenile treatment) before he reached the age of 20. *See* AS 47.12.030(a) and AS 47.12.100(b).

Instead of litigating the issue of his amenability to treatment, Wilson instead attacked the constitutionality of AS 47.12.030(a)—specifically, the portion of the statute that placed the burden on him to prove his amenability to juvenile treatment. Wilson contends that the statute violates the equal protection and due process clauses of the Alaska Constitution. He renews these contentions on appeal.

Wilson points out that, if the original charge against him had been second-degree assault (a class B felony), then he would have been prosecuted under the juvenile system unless the State affirmatively proved his lack of amenability to treatment. Wilson argues that, because he was acquitted of the two more serious felonies charged against him, he should be treated as if he had never been charged with these crimes. That is, Wilson argues that, before he can be convicted and sentenced as an adult, the State should have to bear the burden of proving his lack of amenability to juvenile treatment, rather than the burden being placed on him to prove his amenability to treatment.

We addressed and rejected this same equal protection argument in *State v. Ladd.*[5] *Ladd* is dispositive of Wilson's equal protection claim. *Ladd* also leads us to reject Wilson's substantive due process claim—because, as explained in *Ladd*, "[t]here is a reasonably close fit between the legislature's purpose and the means the legislature has employed to effect that purpose".[6]

■ In his reply brief, Wilson mounts various procedural due process attacks on the statute. Some of these attacks are answered in our recent decision in *Nao v. State.*[7] To the extent that Wilson raises arguments not explicitly covered in *Nao*, we decline to address these arguments because they are raised for the first time in Wilson's reply brief.[8]

We therefore uphold Wilson's conviction against his various constitutional attacks.

*Wilson's challenges to the jury instructions*

Wilson next argues that his trial judge made several errors when instructing the jury.

■ Wilson first claims that the trial judge should have instructed the jury that proof "beyond a reasonable doubt" requires proof to the "[u]tmost certainty". We do not agree. While various formulations have been proposed and employed for defining "reasonable doubt" and "beyond a reasonable doubt",[9] the cases are virtually unanimous that "proof beyond a reasonable doubt" need not be "proof to an absolute certainty".[10]

---

5. 951 P.2d 1220, 1224–26 (Alaska App.1998), *petition for hearing granted*, 9/14/98 (Supreme Court File No. S–8495).

6. 951 P.2d at 1225.

7. 953 P.2d 522 (Alaska App.1998).

8. *See Petersen v. Mutual Life Ins. Co. of New York*, 803 P.2d 406, 411 (Alaska 1990); *Hitt v. J.B. Coghill, Inc.*, 641 P.2d 211, 213 n. 4 (Alaska 1982).

9. "Although this standard is an ancient and honored aspect of our criminal justice system, ['reasonable doubt'] defies easy explication." *Victor v. Nebraska*, 511 U.S. 1, 5, 114 S.Ct. 1239, 1242, 127 L.Ed.2d 583 (1994). See the discussion of various formulations of "reasonable doubt" in *Rivett v. State*, 578 P.2d 946, 949–950 (Alaska 1978).

10. "[A]bsolute certainty is unattainable in matters relating to human affairs." *Victor v. Nebraska*, 511 U.S. at 13, 114 S.Ct. at 1246. In *Victor*, the United States Supreme Court rejected constitutional challenges to the following definition of "reasonable doubt":

"Reasonable doubt" is such a doubt as would cause a reasonable and prudent person, in one of the graver and more important transactions of life, to pause and hesitate before taking the represented facts as true and relying and acting thereon. It is such a doubt as will not permit you, after full, fair, and impartial consideration of all the evidence, to have an abid-

The trial judge in the present case could properly reject Wilson's proposed language—requiring the State to prove his guilt to an "utmost certainty"—because this phrase could easily be interpreted by the jurors as requiring proof to an absolute certainty.

The jury received the Alaska pattern jury instruction on the definition of reasonable doubt and proof beyond a reasonable doubt:

> It is not required that the prosecution prove guilt beyond all possible doubt, for it is rarely possible to prove anything to an absolute certainty. Rather, the test is one of reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense. Proof beyond a reasonable doubt must be proof of such a convincing character that, after consideration, you would be willing to rely and act upon it without hesitation in your important affairs. A defendant is never to be convicted on mere suspicion or conjecture.

We conclude that the trial judge did not abuse her discretion when she gave this pattern instruction instead of using Wilson's proposed phrasing.[11]

■ Wilson next challenges the jury instruction that discussed his decision not to testify at trial. Wilson offered two instructions on this issue. Wilson's first proposed instruction stated that "[a] defendant who chooses not to testify still retains the presumption of innocence". Wilson's second proposed instruction stated that, in deciding whether to take the stand, a defendant can base his decision on the evidence presented at trial or the State's failure to produce

evidence. This instruction also stated that a defendant's decision not to testify may not be used as a means of proving the charges against him.

The trial judge rejected both of Wilson's proposed instructions. Instead, she instructed the jury:

> It is a constitutional right of a defendant in a criminal trial that he may not be compelled to take the witness stand to testify. No presumption of guilt may be raised and you must not draw any inference of any kind from the fact that a defendant does not testify, nor should this fact be discussed by you or enter into your deliberations in any way.

In a separate instruction, the trial judge also told the jury:

> A defendant has the absolute right not to testify, and you must not draw any inference against the defendant for not testifying. . . . Because the burden is on the prosecution to prove every essential element of the crime charged, beyond a reasonable doubt, a defendant has the right to rely upon failure of the prosecution to establish such proof.

■ These instructions were legally sound, and they fully informed the jury concerning the applicable law. The trial judge did not abuse her discretion when she chose these instructions in favor of the ones proposed by Wilson. There is, moreover, an affirmative reason to reject Wilson's second proposed instruction: it invited the jury to speculate as to Wilson's reasons for deciding

ing conviction, to a moral certainty, of the guilt of the accused. *At the same time, absolute or mathematical certainty is not required. You may be convinced of the truth of a fact beyond a reasonable doubt and yet be fully aware that possibly you may be mistaken. You may find an accused guilty upon the strong probabilities of the case, provided such probabilities are strong enough to exclude any doubt of his guilt that is reasonable.* A reasonable doubt is an actual and substantial doubt reasonably arising from the evidence, from the facts or circumstances shown by the evidence, or from the lack of evidence on the part of the State, as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture.

511 U.S. at 18, 114 S.Ct. at 1249 (emphasis added). In particular, the Court rejected a challenge to the "strong probabilities" language. 511 U.S. at 22, 114 S.Ct. at 1251.

See the instruction concerning "reasonable doubt" approved by the Alaska Supreme Court in *Rivett*, 578 P.2d at 949 n. 7. *See also Ramirez v. Hatcher*, 136 F.3d 1209, 1212 (9th Cir.1998) (approving the phrasing, "Doubt to be reasonable must be actual and substantial, not mere possibility or speculation.")

**11.** *See Jackson v. State*, 890 P.2d 587, 596 (Alaska App.1995) (a trial judge's decisions concerning the wording of jury instructions will be upheld unless the trial judge's wording is shown to be an abuse of discretion).

not to testify. Such speculation would be totally improper.

█ Wilson's next claim of error concerns the jury instruction addressing the inferences that may be drawn from a person's knowing conduct. Wilson proposed the following instruction:

> You may, but need not, infer that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. You may, but need not, consider any such inference, should you choose to make it, in determining whether or not the prosecution has proved beyond a reasonable doubt that the defendant possessed the required intent.

The trial judge declined to give Wilson's proposed instruction. Instead, she instructed the jury:

> It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts he knowingly does or omits.

On appeal, Wilson argues that the trial judge's instruction was, in effect, a directive to the jury that they should *presume* that Wilson intended the natural and probable consequences of his actions.

In *Menard v. State* [12], the supreme court declared that it is error to instruct jurors that, in the absence of evidence to the contrary, they should presume a person's intent from the natural and probable consequences of that person's actions. However, we do not read the instruction in Wilson's case to embody or suggest this kind of outlawed evidentiary presumption. In *Gargan v. State* [13], this court concluded that a similarly-worded jury instruction did not violate *Menard*. The instruction in *Gargan* read:

> It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts he knowingly does or knowingly omits. . . . Any such reasonable inferences are entitled to be considered by the jury in determining whether or not the prosecution has proved beyond a reason-

able doubt that the defendant possessed the required intent.

*805 P.2d at 1005.* The instruction in Wilson's case, like the instruction in *Gargan,* speaks of a permissive inference, not a presumption. That is, the jury could infer that Wilson intended the natural and probable consequences of his actions, but they were not required to draw this inference or make this finding.

As this court stated in *Gargan* [14], the ultimate question is whether, taking the jury instructions as a whole, Wilson's jury understood that it was the State's burden to prove (beyond a reasonable doubt) every element of the offenses charged against Wilson—including all of the applicable culpable mental states. The challenged jury instruction did not direct the jury to presume that Wilson acted with the required culpable mental state, and the trial judge's other instructions repeatedly stressed to the jury that the burden always lay upon the State to prove Wilson guilty. We conclude that the trial judge did not abuse her discretion in choosing her wording over Wilson's.

█ Wilson's final attack on the jury instructions concerns the instruction dealing with witnesses' prior out-of-court statements. The trial judge instructed the jury:

> Prior statements of witnesses which are inconsistent with their trial testimony may be used by you both to determine the facts and to determine [the] credibility of the witness. However, prior statements of witnesses which are consistent with their trial testimony may be considered by you only to determine credibility of the witness.
>
> It is up to the jury to decide which statements, if any, you believe and what weight to give those statements.

Wilson proposed alternative wording—wording which, on appeal, he characterizes as "clearer and [a] more accurate statement of the law". That is not the test. Under the "abuse of discretion" standard of review, the question is whether the trial judge's wording

---

**12.** 578 P.2d 966, 968–970 (Alaska 1978).

**13.** 805 P.2d 998, 1005 (Alaska App.1991).

**14.** *Id.*

wrongly stated the law or was otherwise likely to have led the jury astray. Wilson has failed to show this. Accordingly, we uphold the trial judge's wording.

Having rejected all of Wilson's attacks on his conviction, we now turn to his sentencing argument.

*Was Wilson subject to a presumptive term under former AS 12.55.125(d)(3)?*

■ As we have already explained, Wilson was convicted of second-degree assault, a class B felony. Because Wilson was a first felony offender, he normally would not face a presumptive term for this crime. However, the superior court ruled that Wilson was subject to a 2–year presumptive term pursuant to former AS 12.55.125(d)(3) (now repealed) [15], because his assault was directed at a correctional officer who was engaged in the performance of her duties. Wilson challenges this ruling on appeal.

The statute at issue, AS 12.55.125(d)(3), stated:

A defendant convicted of a class B felony may be sentenced to a definite term of imprisonment of not more than 10 years, and shall be sentenced to the following presumptive terms, subject to adjustment as provided in AS 12.55.155—12.55.175:

. . .

(3) if the offense is a first felony conviction, and the defendant knowingly directed the conduct constituting the offense at a uniformed or otherwise clearly identified peace officer, fire fighter, correctional officer, emergency medical technician, paramedic, ambulance attendant, or other emergency responder who was engaged in the performance of official duties at the time of the offense, [the presumptive term is] two years.

Whether Wilson was subject to a 2–year presumptive term hinges on whether the victim of his assault, a counselor at the McLaughlin Youth Center, was a "correctional officer" within the meaning of this statute.

Neither Title 11 nor Title 12 of the Alaska Statutes contains a definition of "correctional officer". Wilson points out that this phrase is defined in AS 18.65.130—290, the group of statutes establishing the Alaska Police Standards Council (the government agency charged with setting minimum standards for police officers, probation and parole officers, and correctional officers). In particular, AS 18.65.290(2) defines "correctional officer" as

a person appointed by the commissioner of corrections whose primary duty under AS 33.30 is to provide custody, care, security, control, and discipline of persons charged or convicted of offenses against the state or held under authority of state law[.]

Essentially the same definition is found in 13 AAC 85.900(3).

Wilson points out that youth counselors at McLaughlin Youth Center do not qualify as "correctional officers" under this definition because they are not employees of the Department of Corrections. Rather, counselors at McLaughlin are employees of the Department of Health and Social Services (the department of state government that runs juvenile institutions).[16]

Wilson is correct that youth counselors at McLaughlin are not "correctional officers" within the meaning of AS 18.65.290(2). But this statutory definition does not control the issue before us. When the legislature enacted the definition of "correctional officer" contained in AS 18.65.290(2), the legislature specified that this definition was to apply only for purposes of interpreting AS 18.65.130—290 (the statutes defining the powers and duties of the Police Standards Council). Likewise, the definition of "correctional officer" contained in 13 AAC 85.900(3) applies, by its terms, only to 13 AAC 85.

This does not mean that the definition of "correctional officer" contained in AS 18.65.290(2) is necessarily irrelevant to the interpretation of the sentencing statute at issue in Wilson's case, AS 12.55.125(d)(3). However, there is a substantial difference

**15.** *See* SLA 1996, ch. 6, § 6. A similar provision still exists in AS 12.55.125(c)(2), which imposes an enhanced presumptive term on first felony offenders convicted of class A felonies.

**16.** *See* AS 47.14.010—050 and AS 47.14.100—130; *see also* AS 47.05.010(13).

between the legislative policies underlying these two statutes.

The stated legislative purpose behind AS 18.65.130—290 was the desire to set minimum standards for certain categories of law enforcement officers.[17] On the other hand, AS 12.55.125(d)(3) appears to have been intended to deter and to punish assaults directed against people whose public duty not only exposes them to assault but also forbids them from turning away and avoiding the assault: police officers; firefighters; emergency medical technicians, paramedics, and ambulance attendants; and correctional officers.

As explained above, there is no definition of "correctional officer" in either Title 11 or Title 12. There is, however, a definition of "correctional facility" in Title 11. "Correctional facility" is defined in AS 11.81.900(b)(7) as "premises, or a portion of premises, used for the confinement of persons under official detention". The phrase "persons under official detention" includes delinquent minors in the custody of the Department of Health and Social Services, because "official detention" is defined in AS 11.81.900(b)(36) to include any "custody . . . under an order of a court in a . . . juvenile proceeding". Thus, juvenile institutions run by the Department of Health and Social Services—institutions such as the McLaughlin Youth Center—are "correctional facilities" for purposes of the criminal code.

The State argues that, if the McLaughlin Youth Center is a "correctional facility" for purposes of Title 11, it would seem logical to classify the people who supervise McLaughlin inmates as "correctional officers". Besides logic, there is also statutory support for the State's argument.

AS 18.65, AS 33.05, and AS 33.16 use terms such as "corrections officer", "probation officer", and "parole officer" to describe the persons employed in the adult corrections system.[18] The legislature chose a different term—"youth counselor"—to describe the people who perform analogous functions within the juvenile justice system. This term is defined in AS 47.12.270:

> The department [of Health and Social Services] may employ youth counselors. Youth counselors shall exercise the duties of probation officers and shall prepare preliminary investigations for the information of the court. They shall also carry out other duties in the care and treatment of ·minors that are consistent with the intent of this chapter. Youth counselors have the powers of a peace officer with respect to the service of process, the making of arrests of minors who violate state or municipal law, and the execution of orders of the court relating to juveniles, and shall assist and advise the courts in the furtherance of the welfare and control of minors under the court's jurisdiction.

A noteworthy component of this statutory definition is the directive that youth counselors "shall also carry out other duties in the care and treatment of minors that are consistent with the intent of this chapter". Apparently based on this clause of the statute, the Department of Health and Social Services has interpreted the term "youth counselor" to encompass the people who supervise and control the residents of juvenile institutions.[19] In 7 AAC 52.170, "Training of Youth Counselors", the Department specifies that all youth counselors must receive training in the following areas:

(1) care and control of children and institutional security procedures;

(2) self-defense;

(3) treatment and program procedures;

(4) [the] juvenile code (AS 47 and Children's Rules);

(5) first aid and emergency medical treatment;

(6) administration of medication;

(7) report writing;

(8) counseling and other interpersonal communication techniques; and

(9) the provisions of this chapter.

---

17. *See* AS 18.65.130.

18. *See* AS 18.65.220, AS 18.65.242—245, and 18.65.290; AS 33.05, AS 33.16.

19. *See* 7 AAC 52.900(5), which defines "counselor" as "a person who provides counseling, care, and supervision services for residents of a juvenile institution".

In other words, the "youth counselors" employed by the Department of Health and Social Services at juvenile institutions like McLaughlin are expected to perform duties that are analogous to the duties entrusted to corrections officers at adult institutions.

Like their counterparts at adult correctional institutions, the youth counselors who supervise and control the inmates at juvenile institutions are duty-bound to expose themselves to potential assault and duty-bound not to turn away when assault actually occurs. Thus, they are members of the same class of public employees that the legislature wished to protect and vindicate when the legislature enacted former AS 12.55.125(d)(3).

Because of this, and because the legislature specifically limited the applicability of the contrasting definition of "correctional officer" contained in AS 18.65.290(2), we conclude that the term "correctional officer" used in former AS 12.55.125(d)(3)—and used in present AS 12.55.125(c)(2)—encompasses the youth counselors who supervise the inmates at the McLaughlin Youth Center. The superior court therefore correctly ruled that Wilson was subject to a 2–year presumptive term for his assault on Baskin.

*Conclusion*

The judgement of the superior court is AFFIRMED.